## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE WORLD HEALTH ALTERNATIVES, INC. SECURITIES LITIGATION | : <br> : <br> :    Master File No.: 2:05-cv-1194 (TMH) <br> : <br> : |

## CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page No.**

I. SUMMARY AND OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. PARTIES AND PRINCIPAL PARTICIPANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    LEAD PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    WORLD HEALTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    McDonald . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.    Control Person Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.    Accounting and Transfer Agent Defendants . . . . . . . . . . . . . . . . . 7

IV. CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VI. MANIPULATIONS THAT PERSONALLY ENRICHED McDONALD . . . . . . . . . . 12

    A.    WITHHOLDING TAX FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.    IMPROPER ACCOUNTING FOR SHARES ISSUED . . . . . . . . . . . . . . . 15

VII. MANIPULATIONS THAT ARTIFICIALLY INFLATED THE PRICE OF WORLD HEALTH STOCK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VIII. MANIPULATIONS THAT ARTIFICIALLY INCREASED WORLD HEALTH'S BORROWING CAPACITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IX. FALSE PUBLIC STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    SARBANES-OXLEY CERTIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    FALSE FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**X. THE DISCLOSURE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

**XI. ALLEGATIONS RESPECTING SCIENTER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

**XII. LOSS CAUSATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**XIII. NO SAFE HARBOR** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

**FIRST CLAIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

      **VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
      PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS** . . . . . . . . . **38**

**SECOND CLAIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

      **VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE
      CONTROL PERSON  DEFENDANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**JURY TRIAL DEMANDED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**

## I. SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of purchasers of the common stock of World Health Alternatives, Inc. ("World Health" or the "Company") between August 17, 2004 and August 19, 2005 inclusive (the "Class Period"), against certain of World Health's former officers and directors, its then external auditor, Daszkal Bolton LLP ("Daszkal Bolton"), and its stock transfer agent, Manhattan Transfer Registrar Co. ("Manhattan Transfer") for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      As alleged herein, during the Class Period, defendants caused World Health to misrepresent its financial condition in publicly disseminated press releases and Securities and Exchange Commission ("SEC") filings.  In addition, defendants repeatedly represented that the Company's financial statements, which were included in its SEC filings and press releases during the Class Period, were reliable in that they were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and further certified that the Company's internal controls were effective and reliable.

3.      Unbeknownst to investors, however, the Company's reported success was an illusion. Rather, the Company was the victim of a successful fraud by its Chief Executive Officer, Richard McDonald, who personally enriched himself by millions of dollars at the Company's and investors' expense, with the complicity of the other named defendants.  The scheme collapsed shortly after McDonald, resigned from the Company in August 2005, causing an immediate collapse in the Company's stock price, and leading directly to its Bankruptcy six months later.

4.      There were three general categories of fraudulent activities that comprised defendants' scheme:

a.   manipulations that enriched former Chief Executive Officer Richard McDonald at the expense of the Company;

b.   manipulations that artificially inflated World Health's operating income and reported margins; and

c.   manipulations that enabled World Health to increase its borrowing, thus postponing the time when the Company would run out of cash.

All of the kinds of fraud were interconnected, and all ultimately resulted in investors in World Health common stock losing their investments.

5.      Richard McDonald was the principal financial beneficiary of the frauds, but he did not, and could not, act on his own. In documents distributed to investors and filed with the SEC, each of the defendants represented that World Health's financial statements accurately described the Company's financial condition. Lead Plaintiffs and other investors were entitled to, and did, rely on these defendants for assurance that World Health's published financial statements were accurate and not works of fiction.

6.      Each of the defendants intentionally or recklessly participated in McDonald's fraud by signing false financial statements or press releases, or in the case of Manhattan Transfer Registrar Co., by knowingly acquiescing in World Health's publication of false information concerning the number of shares outstanding. McDonald's scheme depended on the participation of each of the other defendants, and had any of them acted appropriately to prevent the publication of false financial statements, the fraud would have failed.

7.      This Complaint is based on Lead Plaintiffs' own knowledge as to their own securities transactions and the allegations in ¶¶ 53 and 57, and on the investigation of Counsel, including interviews with confidential witnesses. The allegations in ¶¶ 36 - 39, 42, 44 - 47, 50, 51, 54, 58, and

103 are based, in large part, on information provided by Confidential Witness 1 ("CW1"), a former officer of World Health, who participated in an internal investigation following McDonald's resignation on August 15, 2005. Lead Plaintiffs' investigation is continuing. Lead Plaintiffs have not yet uncovered all of the different manipulations that McDonald and the other defendants employed. Discovery in this Action has not yet commenced; the results of the Company's internal investigation have not been disclosed; and ongoing investigations by the FBI and the SEC have not yet led to indictments or other public disclosure of wrongdoing. Lead Plaintiffs anticipate that further investigation will lead to additional frauds not yet known.

## II. JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Control Person Defendants maintained their principal places of business within this District.

11.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

3

to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES AND PRINCIPAL PARTICIPANTS

### A.    LEAD PLAINTIFFS

12.    Lead Plaintiffs Columbus Capital Offshore Fund, Ltd. and Columbus Capital Partners L.P. are hedge funds based in San Francisco, California, and were appointed Lead Plaintiff in this action by Court Order of December 13, 2005.  Lead Plaintiffs lost over $10,000,000 on their investments in World Health common stock during the Class Period.  A schedule of their transactions in World Health common stock is attached to this Complaint as Exhibit A.

### B.    WORLD HEALTH

13.    Non-Party World Health described itself as a provider of healthcare staffing services to hospitals and other healthcare facilities.  It became a publicly traded company on February 20, 2003, when defendant McDonald and his business partner, Marc D. Roup, merged their private company, Better Solutions, Inc., into a public shell company.  McDonald and Roup initially owned 82% of World Health's shares.  World Health expanded rapidly in 2003 and 2004 through acquisitions.  World Health filed for bankruptcy on February 21, 2006, and its assets are now being auctioned off.  Because an action against it would be subject to an automatic Bankruptcy stay, it is not named as a defendant.

### C.    DEFENDANTS

#### 1.    McDonald

14.    Defendant Richard McDonald served as President, Principal Financial Officer, Principal Accounting Officer and Chairman of the Board of Directors of World Health from its

inception as a public company on February 20, 2003, until June 2004, at which time he became Chief Executive Officer as well. He held all of these titles until mid-2005, when the Company hired a Chief Financial Officer, but he remained Chief Executive Officer and Chairman. On August 15, 2005, McDonald abruptly resigned from all of his positions at World Health. McDonald was also World Health's second largest shareholder, claiming ownership of 6,194,000 shares, or 22.5% of all common stock, as of April 27, 2004.

15.     In several documents filed with the SEC, including the 2003 Annual Report on Form 10-KSB, McDonald described his educational background as follows:

> Mr. McDonald received the following degrees in Business Administration: (a) In April 1996, a Bachelor of Science Degree from the University of Pittsburgh; (b) in May 2000, a Masters Degree from Bridgewater University located in London, England; and (c) in May 2001, a Doctoral Degree from Bridgewater University.

16.     However, these representations were false. On July 15, 2004, before the beginning of the Class Period, McDonald signed and filed a Form 8-K with the SEC stating:

> it was confirmed that Mr. McDonald did attend the University of Pittsburgh but the records available at the time could not confirm that he graduated with a B.S. degree.

17.     The Form 8-K stated that all educational credentials should be deemed excised from Mr. McDonald's biography. In fact, McDonald had not graduated from the University of Pittsburgh, and Bridgewater University is an unaccredited diploma mill that offers degrees over the internet without requiring any significant work to be completed.

18.     Despite his many hats, McDonald purportedly received almost no disclosed compensation from World Health in 2004. According to the Company's 2005 Proxy Statement, filed with the SEC in May 2005, McDonald received $9,615 in salary for 2004, and automobile lease

payments worth $12,000. However, as explained in detail infra, McDonald nonetheless personally enriched himself at the expense of World Health and its investors.

### 2. Control Person Defendants

19.     Defendant John W. Higbee was a member of World Health's Board of Directors beginning in February 2004, and served as Chair of the Audit Committee. He had previously served as head of the audit division of the Pittsburgh office of Arthur Andersen LLP, and was a Certified Public Accountant.

20.     Defendant Frederick R. Jackson, Sr. was a member of World Health's Board of Directors and its Audit Committee. In the 2004 Proxy Statement, he was described as having "expertise in the areas of fixed asset structuring, multi-location profit centers and corporate structure and finance." Higbee and Jackson, along with McDonald, constituted the entire Board of Directors.

21.     Defendant John Sercu was Chief Operating Officer of World Health beginning in May 2004, and was appointed Acting Chief Executive Officer following McDonald's resignation on August 15, 2004. Prior to joining World Health, he had been Chief Executive Officer of Pulse Healthcare Staffing, a company acquired by World Health in May 2004. He received over 1,000,000 shares of World Health common stock in connection with the acquisition of Pulse Healthcare. In 2004, he was the highest paid employee of World Health, and the only officer whose disclosed compensation exceeded $100,000. In sum, in the absence of a Chief Financial Officer, Sercu was the only employee, other than McDonald of World Health, with sufficient authority to exert control over World Health. The "Risk Factors" section of the 2004 Form 10-KSB stated:

6

**We are dependent on certain of our employees**.

Richard McDonald, our President and John Sercu, our Chief Operating Officer, make the majority of our management decisions. Mr. McDonald is essential to our operations because he oversees the financial aspects of our business. Mr. Sercu is responsible for sales and operational matters.

### 3. Accounting and Transfer Agent Defendants

22. Defendant Daszkal Bolton, LLP was World Health's auditor at all relevant times until it was dismissed on August 19, 2005. In that capacity it performed both annual audits and quarterly reviews of World Health's financial statements. It signed World Health's 2003 and 2004 Annual Reports, offering unqualified opinions each time, and also approved the release of quarterly financial reports for each quarter of 2004 and the first quarter of 2005. After it was dismissed by world Health, Daszkal Bolton filed a letter with the SEC affirming that it had had no significant disagreements with World Health on matters of accounting principles or practices, financial statement disclosure, or auditing scope of procedure that had not been resolved prior to the second quarter of 2005. The Daszkal Bolton audit team was led by Patrick Heyn, a partner at the firm, and included Kerensa Butler and Angela Lyrintzes.

23. Defendant Manhattan Transfer Registrar Co. ("Manhattan Transfer") was the transfer agent for World Health's common stock. Its responsibilities included properly accounting for the number of shares of stock issued by World Health, and reconciling its accounting with information released to the public by World Health.

### IV. CLASS ACTION ALLEGATIONS

24. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased common stock

of World Health between August 17, 2004 and August 19, 2005, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company and the Accounting and Transfer Agent Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest. Also excluded are entities who acquired common stock in exchange for non-cash consideration, such as the sale of privately held businesses to World Health.

25.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, World Health had at least 31 million shares of common stock outstanding, and the common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by World Health or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

27.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

8

28.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    whether the 1934 Act was violated by defendants;

    b.    whether defendants omitted and/or misrepresented material facts;

    c.    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    whether defendants knew or recklessly disregarded that their statements were false and misleading;

    e.    whether the price of World Health common stock was artificially inflated; and

    f.    the extent of damages sustained by Class members and the appropriate measure of damages.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### V. BACKGROUND

30.    In a February 2005 Prospectus, World Health described its business and history as follows:

We are a provider of healthcare staffing services to hospitals and other healthcare facilities throughout the United States. We provide our clients with timely and flexible staffing solutions through either temporary or permanent placements of healthcare personnel. Our integrated staffing services are designed to meet all of our

9

clients' staffing requirements and include interviewing, screening and selecting our clients' prospective personnel. These services enable our clients to optimize their staffing needs in a flexible and timely manner while decreasing overall staffing costs.

We were incorporated in Florida on February 13, 2002. On February 20, 2003, we completed the acquisition of 100% of the outstanding common stock of Better Solutions, Inc. ("Better Solutions"), a Pennsylvania corporation headquartered in Pittsburgh, Pennsylvania that provided local allied and nursing healthcare staffing services from offices in Pennsylvania, Ohio and Florida. Since December 2003, our business has grown significantly, in part through our acquisition of the operations of six medical staffing companies and one general staffing company that provided medical, professional and administrative staffing services. These acquisitions have expanded our services to include travel and per diem staffing of nurses, allied professionals and physicians, and provided us with a nationwide presence and infrastructure.

Our staffing operations are conducted through our three operating entities: (a) World Health Staffing, Inc., a Delaware corporation, which provides primarily nurse and allied staffing on both a travel and per diem basis, as well as a limited amount of information technology and general administrative and professional staffing; (b) World Health Staffing, Inc., a California corporation, which provides nurse and allied staffing on both a travel and per diem basis; and (c) J&C Nationwide, Inc., a Delaware corporation which provides physician or "locum tenens" staffing on a travel and per diem basis. Our integrated staffing services are designed to meet all of our clients' staffing requirements and include interviewing, screening and selecting our clients' prospective personnel. These services enable our clients to optimize their staffing in a flexible and timely manner while decreasing overall staffing costs.

Our healthcare staffing business is primarily comprised of (a) nurse staffing, which generally includes registered nurses, licensed practical nurses and certified nurse's aides, (b) allied health staffing and (c) physician staffing. We provide these placements on a travel basis and a per diem basis. We also provide a limited amount of support services staffing and information technology staffing for clients in the healthcare industry and other industries. We have provided such staffing services to over 3,000 healthcare facilities in all 50 states and the District of Columbia and operate sales offices in Alabama, California, Florida, Georgia, Massachusetts, New Hampshire, North Carolina, Pennsylvania, Ohio, Oregon, Utah and Washington. During our fiscal year ended December 31, 2004, we directly placed or assisted in the placement of approximately 7,500 healthcare professionals.

31.     The fast growth of the Company was the result of the following six acquisitions in a one year period:

* Superior Staffing Solutions, Inc., of Pittsburgh, acquired on December 22, 2003 for $4 million cash, 305,343 shares of common stock, and assumption of $392,000 debt;

* Pulse Healthcare Staffing, Inc., of Citrus Heights, California, acquired on April 30, 2004, for $13.3 million cash and 100,000 shares of common stock;

* Care For Them, Inc., of Massachusetts acquired on May 7, 2004, for $242,000 and additional contingent payments;

* Curley and Associates, LLC, acquired June 1, 2004, for $1.5 million cash, 662,025 shares of common stock, and additional contingent payments;

* Travel Nurse Solutions, Inc., of Alabama and Ohio, acquired October 14, 2004, for $6.3 million cash and 747,950 shares of common stock, with additional contingent payments to be made in stock;

* J&C Nationwide, Inc., of Atlanta, acquired on November 15, 2004, for $7.2 million cash, 182,481 shares of common stock, and assumption of $260,000 debt.

32.     Significant portions of the cash were to be paid in installments, so the acquisitions caused huge increases in World Health's assets and in its liabilities. World Health's reported revenue grew from $3.7 million in 2003 to $40.4 million in 2004, and its disclosed market capitalization quintupled from $21.4 million on March 25, 2004 to $119 million on March 31, 2005. By year-end 2004, the Company had 309 corporate employees and 1100 full time equivalent healthcare staffing professionals.

33.     Incredibly, despite the explosive growth, the Company still did not have a full time Chief Financial Officer. Rather, Richard McDonald served as both Chief Executive Officer and Principal Financial Officer until the middle of 2005.

11

34.     World Health also had a small Board of Directors, containing only three members: McDonald, Higbee, and Jackson. It did not hold an Annual Meeting of Stockholders in either 2003 or 2004, as such, none of the Directors had been elected by public shareholders. McDonald had become a Director prior to the Company becoming public, and he appointed Higbee and Jackson to their positions in early 2004.

35.     Throughout the Class Period, until his resignation on August 15, 2005, McDonald exerted an unusual degree of control over World Health and its financial record keeping. For example, he personally made entries for payroll accounts into the Company's computer system. He also had administrative access to the computers of all employees at company headquarters, so that he could alter or delete any employee's documents, without their knowledge. No one else exercised remotely comparable authority. As all of the defendants were aware, McDonald, himself, was the only internal control at the Company, and no one made any effort to control McDonald, or to determine whether his reports to the other defendants were independently verifiable.

## VI. MANIPULATIONS THAT PERSONALLY ENRICHED McDONALD

### A.     WITHHOLDING TAX FRAUD

36.     Beginning no later than the third quarter of 2004, McDonald caused World Health to stop paying employees' withholding taxes to the United States government, although its employees' paychecks indicated that appropriate amounts had been withheld. McDonald concealed the nonpayment from the Company's bookkeeping employees as follows:

37.     Payroll software correctly recorded the amount withheld from each paycheck as a liability of World Health. That entry should have included a payroll tax liability accrual. Initially the liability was recorded, then reduced by an offsetting entry to the "Richard McDonald loan"

12

account. Thus, a cursory review of bookkeeping entries would suggest that instead of owing the amount of payroll taxes withheld for the United States government, World Health owed those amounts to Richard McDonald.

38.    Fictitious debts to McDonald first appear in World Health's published financial statements in the second quarter of 2004. The Form 10-QSB for that quarter lists a "Related Party loan" as a $1,518,571 liability. There is no textual explanation.[1] The Form 10-QSB for the third quarter listed a "related party loan" of $3,644,307, again without explanation. This amount was also the bookkeeping entry that offset the accrual for taxes, in addition to other questionable amounts.

39.    In the Annual Report for 2004, the amount of the "Related Party loan" was reported to be $3,010,420. The apparent reduction from the third quarter reported loan of $3,644,307 was the result of World Health beginning to "repay" the purported loan: McDonald caused World Health to transfer corporate funds to himself. In fact, the amount of unpaid taxes was continuing to increase -- and World Health had never received any loan from McDonald. Note 11 of the financial statements read:

> At December 31, 2004, there is a $3,010,420 loan from the Company's President and Chief Executive Officer, Richard McDonald. The loan is of a demand nature without any interest rate.

40.    In its audit of the year-end financial statement, Daszkal Bolton utterly failed to investigate numerous red flags associated with this liability and footnote, including:

      a.    The loan appeared in World Health's payroll account;

---

[1]    The first quarter financial statement listed a "loan payable, related party" liability of $25,000. Note 6 for that financial statement reads: "In the first quarter of 2004, a significant shareholder loaned the Company $25,000 to fund operations. The loan is non-interest bearing and has no formal terms of repayment." This brief explanation of a small loan makes the complete absence of any explanation for a "related party loan" 60 times larger all the more baffling.

     b.    The loan amount was more than ten times McDonald's annual salary. McDonald was 31 years old, was virtually unpaid in 2003 and had never received salary above $200,000 per year, and had not sold large amounts of stock or otherwise come into money sufficient to explain his apparent willingness to lend such a huge sum to his employer;

     c.    The payroll account listed no accrual for withholding taxes, and there was no company record that such taxes had been paid for the past three quarters; and

     d.    The purported loan was apparently completely undocumented, and purportedly carried no interest.

    41.    Moreover, under Generally Accepted Auditing Standards ("GAAS") AU § 334, a related party transaction should always be given especially close scrutiny in an audit, because of the inherent potential for abuse. AICPA PROF'L STANDARDS, U.S. Auditing Standards ("AU") § 334 (Am. Inst. of Certified Pub. Accountants 2003). However, Daszkal Bolton apparently accepted McDonald's personal explanation instead of seeking independent verification and performing adequate auditing procedures. GAAS outlines numerous substantive procedures auditors must perform concerning related party transactions, and specifically states that the procedures should "extend beyond inquiry of management." AU § 334.09-10. For example, simple review of the "Rich McDonald loan" account would have provided information correlating with entries from the payroll tax liability account, as the amount of the "loan" increased on the same dates and in the same amounts as was needed to offset tax liability.

    42.    In the first quarter of 2005, the financial statement listed a related party loan liability of $1,089,949. Again the reduction in the accounting entry did not reflect payments to the government, but rather, improper transfers of corporate money to McDonald.

43.     Unpaid tax bills and delinquency notices totalling over $4.4 million, exclusive of penalties and interest, were found in McDonald's office at the time of his resignation. At the time of World Health's bankruptcy in February 2006, it declared a tax liability including penalties of $6,946,886.

## B.     **IMPROPER ACCOUNTING FOR SHARES ISSUED**

44.     Beginning before the end of 2004, McDonald caused World Health to inaccurately report its number of shares outstanding. According to the year-end 2004 Annual Report, the Company had 44,099,450 shares outstanding as of December 31, 2004. However, the official registration list maintained by defendant Manhattan Transfer stated that there were several million additional shares outstanding.

45.     McDonald apparently caused World Health to misreport the number of shares outstanding by an extraordinarily simple ruse. He requested the official stock registrar's list from Manhattan Transfer by e-mail, received an accurate spreadsheet, saved it as a WordPad document and edited the entries to reduce the number of shares outstanding. He then provided only the edited list to accounting personnel involved in preparation of quarterly and annual reports.

46.     Daszkal Bolton apparently failed to independently verify the number of shares outstanding. Proper auditing procedures required Daszkal Bolton to independently retrieve the stock registrar's list directly from Manhattan Transfer. *See generally* AU §§ 326.21(a), 330. This could have been accomplished with minimal effort, as Manhattan Transfer could easily provide the documentation by e-mail. Daszkal Bolton's failure to do this represented a reckless departure from GAAS. Additional procedures to verify common stock issuances, as well as issuances of other classes of stock, should have been performed.

15

47.     The discrepancy between actual and reported shares outstanding grew to several million shares by the end of the first quarter of 2005, and continued to grow until the time of McDonald's resignation.

48.     Lead Plaintiffs are continuing to investigate how the unreported shares were distributed. Lead Plaintiffs believe that most of the unreported shares were sold into the open market by McDonald, perhaps indirectly, through family members, friends, or members of his church. The purpose of these improper stock issuances was to personally enrich McDonald.

49.     The fact that McDonald exercised exclusive control over the recordkeeping and custody of the Company's stock should have alerted Daszkal Bolton to the risk of misappropriation of the stock.   AU § 316.85 A.3, Section titled "Opportunities" at subsection b (noting that "inadequate segregation of duties" is a red flag that should alert an auditor to the risk of misappropriation of assets).

50.     After he learned of the discrepancy between the reported and actual number of shares issued, CW1 contacted Mr. John Ahearn of Manhattan Transfer to inquire whether Manhattan Transfer was aware of the issue. Ahearn responded that he had reconciled his reports against World Health's public filing until mid-2004, but since then had been unable to reconcile the numbers, Mr. Ahearn further told CW1 that he did not pursue this issue.

## VII. MANIPULATIONS THAT ARTIFICIALLY INFLATED THE PRICE OF WORLD HEALTH STOCK

51.     In order to create the appearance of higher revenue, McDonald caused World Health to "extend" each quarter for the J&C Nationwide subsidiary, so that revenue actually received in the first few days of each quarter would be accounted for as having been received in the previous

quarter. McDonald asserted internally that this treatment was justified because J&C Nationwide regularly posted revenue on its books a few days after it was received. However, this was untrue; J&C Nationwide entered cash receipts every day. This manipulation contributed to World Health's apparent ability to meet its earnings forecasts. Because McDonald did not account for costs in the first few days of each quarter in the same manner, this misrepresentation also dramatically improved reported operating earnings.

52. Daszkal Bolton should have been alerted to the "extended quarter" scheme during its cutoff testing. AU § 560.11.

53. In order to improve reported performance in the first quarter of 2005, McDonald added $1 million to operating revenue. He explained to Sercu that the source of revenue was a reality television show that would pay $1 million for the right to film World Health employees in their work. The nature of this revenue source meant that there would be no additional costs associated with the revenue. Thus, the addition of $1 million drastically improved the Company's reported operating margin as well as operational revenue. Subsequent investigation could not confirm that any revenue had been received, or that any reality show had even contacted World Health.

54. Also, beginning in the first quarter of 2005 or earlier, McDonald caused the Company to report income received from the exercise of stock warrants as operational income. Again this income arrives with no associated costs, and greatly improved the Company's reported operating margin.

17

## VIII.  MANIPULATIONS THAT ARTIFICIALLY INCREASED WORLD HEALTH'S BORROWING CAPACITY

55.     On February 18, 2005, World Health announced that it had entered into a revolving

credit term loan and security agreement with Capital Source Financing LLC ("CapSource"). In the

Form 8-K, the Company described the terms of the Agreement as follows:

> Under the Revolving Credit Facility, the Company may borrow an amount not to
> exceed the lesser of (1) $35 million and (2) an amount equal to 85% of the
> Company's eligible accounts receivables less an aggregate of $1.8 million in liquidity
> and debt service reserves, and any other reserves established from time to time by the
> Lender.

56.     The Company was required to provide CapSource with a "Compliance Certificate"

every month, which stated that no Default or Event of Default had occurred, and certified that the

Company was in compliance with all financial covenants.

57.     Beginning in May 2005, McDonald provided false certifications to CapSource which

raised the available borrowing figure beyond that permitted by the Agreement. For example, he

included government receivables as part of eligible accounts receivables, even though the Agreement

specifically excluded government receivable as ineligible.

58.     Because it provided false certifications of its available credit, and also borrowed very

close to the maximum amount permitted by the false certification, World Health was in default on

the CapSource Revolving Credit Agreement by mid-May 2005. This represented a material change

in World Health's financial condition. The Defendants' failure to disclose the default to both

CapSource and the investing public, which could have been accomplished through a press release

and/or filing of a Form 8-K with the SEC, misled the investing public as to the Company's financial

condition.

18

## IX. FALSE PUBLIC STATEMENTS

**A.**      **SARBANES-OXLEY CERTIFICATIONS**

59.      In the purported compliance with the Sarbanes-Oxley Act, McDonald signed and filed

two certifications concurrently with each Form 10-QSB and Form 10-KSB during the Class Period.

The § 302 certification stated:

I, Richard, E. McDonald, certify that:

1.      I have reviewed this quarterly report on Form 10-QSB of World Health Alternatives, Inc.;

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

4.      I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for World Health Alternatives, Inc. and have:

(i)      Designed such disclosure controls and procedures to ensure that material information relating to World Health Alternatives, Inc. is made known to me by others within the Company, particularly during the period in which the periodic reports are being prepared;

(ii)      Evaluated the effectiveness of World Health Alternatives, Inc's disclosure controls and procedures as of a date within 90 days prior to the filing date of this report ("Evaluation Date"); and

(iii)      Presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

19

5.      I have disclosed, based upon their most recent evaluation, to World Health
        Alternatives, Inc.'s auditors and the audit committee of the Company's Board of
        Directors:

(i)     All significant deficiencies in the design or operation of internal controls which could
        adversely affect World Health Alternatives, Inc.'s ability to record, process,
        summarize and report financial data and have identified for World Health
        Alternatives, Inc.'s auditors any material weaknesses in internal control, and

(ii)    Any fraud, whether or not material, that involves management or other employees
        who have a significant role in World Health Alternatives, Inc.'s internal controls, and

6.      I have indicated in this quarterly report whether or not there were significant changes
        in internal controls or in other factors that could significantly affect internal controls
        subsequent to the date of their most recent evaluation, including any corrective
        actions with regard to significant deficiencies and material weaknesses.

                                    By /s/ Richard E. McDonald

60.     The § 906 certification stated:

In connection with the Quarterly Report of World Health Alternatives, Inc. (the "Company")

on Form 10-QSB for the period ending June 30, 2004 as filed with the Securities and Exchange

Commission on the date hereof (the "Report"), I, Richard E. McDonald, Chief Executive Officer of

the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-

Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the
        Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the
        financial condition and result of operations of the Company.

                                    /s/ Richard E. McDonald

61.     Each time, McDonald filed two copies of each certification, signing one as Chief

Executive Officer and the other as Principal Financial Officer. The consolidation of authority in one

                                            20

individual rendered meaningless the statutory requirement that both the Chief Executive Officer and the Principal Financial Officer provide certifications. <u>See</u> 15 U.S.C. § 78j-1; 18 U.S.C. § 1350(a). Further, Daszkal Bolton should have been alerted to the risk associated with the consolidation of authority in one individual. AU § 316.85 A.2, Section titled "Opportunities" at subsection b.

62.    Each of the certifications was false, because:

        a.    The financial reports did contain untrue statements of material fact as explained above;

        b.    The financial statements did not fairly represent World Health's financial condition;

        c.    World Health's disclosure controls were not adequate to assure all material information was made available to others within the Company, since the only internal controls began and ended with McDonald, and there was no means to detect fraudulent activity by McDonald himself;

        d.    McDonald did not disclose either material weaknesses in the operation of internal controls that make it possible for the manipulations discussed in ¶¶ 36 - 58 above to remain undisclosed, or the fraud he perpetrated; and

        e.    The reports did not fully comply with the requirements of Section 13(a) and 15(d) of the Exchange Act.

63.    The Control Person Defendants knew, or were reckless in failing to make themselves aware of the clear deficiencies in World Health's internal controls, and, in particular, in the concentration of authority in, and lack of checks upon, McDonald, especially in view of his admitted misrepresentation in his educational history, which was known to all of the Control Person Defendants before the beginning of the Class Period. Accordingly, the Control Person Defendants were aware that the certifications contained misrepresentations.

**B.     FALSE FINANCIAL STATEMENTS**

64.     The Class Period begins on August 17, 2004. After the market closed on August 16, 2004, McDonald and the Control Person Defendants caused World Health to issue a press release purporting to report on the Company's financial performance in the second quarter of 2004. The release also contained the Company's purported balance sheet as of June 20, 2004.

65.     The release also stated that World Health's current liabilities included a $1.518 million related party loan. This was false, as there was no related party loan. Rather, this entry masked other liabilities, and facilitated direct payments that could be made directly to Richard McDonald from World Health's limited available cash. This misrepresentation was material because a related party loan would ordinarily have a lower preference in the event of liquidation than other kinds of debt, and would not likely subject the firm to a collection action.

66.     The release also stated that the financial statements were created "following Generally Accepted Accounting Principles." This was false because the financial statement departed from GAAP for the reasons stated in ¶ 65 above.

67.     The financial press release, as a whole, was materially misleading because it did not disclose that McDonald was manipulating financial disclosures in order to conceal the fact that he was enriching himself at the expense of the Company, by, inter alia, claiming to be owed money from a loan.

68.     On August 23, 2004, one week later than the statutory deadline for filing, World Health filed its Form 10-QSB for the second quarter of 2004. This filing contained the same financial misrepresentations as the press release. The Form 10-QSB was signed by McDonald and

22

its contents were approved by the Control Person Defendants. Daszkal Bolton conducted a review of World Health's financial statements and approved the financial statements prior to release as well.

69.     On November 22, 2004, McDonald and the Control Person Defendants caused World Health to issue a press release purporting to report on the Company's financial performance in the third quarter of 2004. The release contained the Company's purported balance sheet as of September 30, 2004. The balance sheet representation was false because there was no liability for substantial unpaid withholding taxes – even though those amounts had been withheld from employee paychecks.

70.     The release also stated that World Health's current liabilities included a $3.644 million related party loan.   This was also false, as there was no related party loan.   The misrepresentation was material because a related party loan would ordinarily have a lower preference in the event of liquidation than other kinds of debt, and would not likely subject the firm to a collection action, unlike the tax liability masked by this false entry.

71.     The release also contained a lengthy quotation from defendant Sercu, who approved its inclusion:

> "We rolled out our performance management tool, called the "Game of Work", in the third quarter and the results have been tremendous. Employees are operating at higher efficiencies and long-standing company sales records are being broken on a regular basis. The Company is firing on all cylinders and lead sharing among the Company's divisions is continuing to increase rapidly. This has helped us achieve a higher utilization of the supply of caregivers currently in our database, higher fill ratios and greater satisfaction among clients and consultants. We also recently launched a new benefits program that provides 100% paid healthcare for our consultants, to encourage them to see World Health as a long-term employment relationship. Our leadership and management depth also increased significantly since the last quarter through key leadership promotions and acquisitions. As a result, we are poised to continue assimilating acquisitions as necessary and building out our organic model."

23

72.     The financial press release, as a whole, was materially misleading because it did not disclose that McDonald was manipulating financial disclosures in order to conceal the fact that he was enriching himself at the expense of the Company, by, inter alia, claiming to be owed money from a loan.

73.     Also on November 22, 2004, again one week later than the statutory deadline, World Health filed its Form 10-QSB for the third quarter of 2004.  This filing contained the same financial misrepresentations as the press release.  The Form 10-QSB was signed by McDonald and its contents were approved by the Control Person Defendants.  Daszkal Bolton conducted a review of World Health's financial statements and approved the financial statements prior to release as well.

74.     On March 20, 2005, after the market closed, McDonald and the Control Person Defendants caused World Health to issue a press release purporting to report on the Company's financial position at year-end 2004.  The release stated that gross profit for the fourth quarter was $3.93 million, and also contained the company's purported balance sheet.  This statement was false because, inter alia:

    a.     the balance sheet included no entry for substantial unpaid withholding tax liability; and

    b.     gross profit included revenue earned in the first few days of 2005 for the J&C Nationwide subsidiary.

75.     The release also stated that World Health's current liabilities included a related party loan of $3.01 million, and no significant liability for employee withholding taxes.  This was also false, as there was no related party loan, but there was a significant liability for unpaid withholding taxes.

24

76.     The financial press release, as a whole, was materially misleading because it did not disclose that McDonald was manipulating financial disclosures in order to conceal the fact that he was enriching himself at the expense of the Company, by, inter alia, claiming to be owed money from a past loan, and by reaping proceeds of sales of undisclosed stock issuances.

77.     The release also contained a lengthy quotation by Sercu, which stated:

"We are on track and continue to execute our plan to become the premier healthcare staffing company in the market. We have exceeded our organic growth expectations and continue to experience the benefits of our integration efforts. Our key performance metrics are increasing and all divisions are seeing the results of efforts to improve profitability.

78.     Sercu's statement was false because, inter alia, World Health remained "on track" in its reported financial performance, not through the benefits of integration efforts, but by leaving taxes unpaid and improperly including some 2005 revenue in 2004 gross profit.

79.     On April 15, 2005, two weeks later than the statutory deadline, World Health filed its Annual Report on Form 10-KSB for 2004. The filing contained the same financial misrepresentations as the press release. The Form 10-KSB was signed by McDonald, Higbee, and Jackson.

80.     Daszkal Bolton signed the following letter that appeared in the Form 10-KSB:

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders
World Health Alternatives, Inc.

We have audited the accompanying consolidated balance sheets of World Health Alternatives, Inc. as of December 31, 2004 and 2003, and the related consolidated statements of operations, changes in shareholders' equity (deficit) and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

25

Except as discussed in the following paragraph, we conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).[2] Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

The Company is currently in consultation with members of the Office of the Chief Accountant of the Securities and Exchange Commission (SEC) regarding the application of Emerging Issues Task Force 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock*, and Financial Accounting Standards Board Statement No. 133 *Accounting for Derivative Instruments and Hedging Activities* to the redemption and conversion features of the preferred stock issued in December 2004. The financial statements for the fiscal year ended December 31, 2004 ("2004 financial statements") reflect the classification of these features of the preferred stock as embedded derivatives as more fully discussed in Note 2. Resolution of the accounting treatment discussion between the Company and the SEC may result in a restatement of the 2004 financial statements.

In our opinion, except for the effects on the 2004 financial statements of such adjustment, if any, as might be determined to be necessary depending on the resolution of the accounting treatment discussed in the preceding paragraph, the financial statements referred to in the first paragraph above present fairly, in all material aspects, the financial position of World Health Alternatives, Inc. at December 2004 and 2003, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ DASZKAL BOLTON LLP

Boca Raton, Florida
April 14, 2005

81.    Daszkal Bolton's representation was false because, inter alia:

---

[2]    The Public Company Accounting Oversight Board ("PCAOB") adopted Generally Accepted Auditing Standards ("GAAS") as its standards. *See* Auditing Standard No. 1 - References in Auditor's Reports to the Standards of the Public Company Accounting Oversight Board, at ¶ 2.

26

a.    it did not conduct an audit in accordance with the standards of the Public Company Accounting Oversight Board as explained in ¶¶ 41, 46, 49, and 52;

b.    it did not obtain reasonable assurances that the financial statements were free of material misstatement; and

c.    the audit did not provide a reasonable basis for Daszkal Bolton's opinion that (except as noted) World Health's financial statements present fairly, in all material respects, the financial position of the Company.

82.    The Form 10-KSB contained the following additional disclosure concerning the purported related party loan:

> "At December 31, 2004, there is a $3,010,420 loan from the Company's President and Chief Executive Officer, Richard McDonald.  The loan is of a demand nature without any interest rate."

83.    This statement was false for the reasons stated in ¶ 75 above.  The misrepresentation was material because it masked an actual tax debt, which, unlike an insider loan, accrued both interest and penalties, and had a higher liquidation preference than a loan from an insider.

84.    On May 13, 2005, McDonald and the Control Person Defendants caused World Health to issue a press release purporting to revise the fourth quarter financial statement. McDonald explained the change as follows:

> Richard McDonald, World Health's President, said, "We recorded the non-cash expenses in the fourth quarter of 2004 because we wanted to utilize a conservative reporting approach until we could consult with the Office of the Chief Accountant and confirm that our position that the preferred stock conversion and redemption features did not create a need for any derivative accounting was correct. Additionally, the Company determined that the warrants associated with the transaction were a liability and therefore the $3,003,591 fair value of the warrants was recorded as a liability. The Company believed it was important to pursue this matter to increase the transparency of its financial reporting and better enable the market to evaluate the Company's financial results in 2004 and in the future. This positive restatement completes the Company's review of this matter as referenced in out 10-KSB for 2004."

85.    This change did not affect any of the misrepresentations discussed in ¶¶ 79 - 83 above.

86.    On May 16, 2005, McDonald and the Control Person Defendants caused World Health to file an Amended Form 10-KSB with the SEC. The same individuals signed the Amended Form, and the financial representations discussed above were unchanged. The Amended Form 10-KSB did not correct or alter any of the misrepresentations listed above.

87.    Amended Form 10-KSB contained the following opinion letter signed by Daszkal Bolton:

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders
World Health Alternatives, Inc.

We have audited the accompanying consolidated balance sheets of World Health Alternatives, Inc. as of December 31, 2004 and 2003, and the related consolidated statements of operations, changes in shareholders' equity (deficit) and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to in the first paragraph above present fairly, in all material respects, the financial position of World Health Alternatives, Inc. at December 2004 and 2003, and the results of their operations and their cash flows for the years then ended in conformity with the accounting principles generally accepted in the United States of America.

These financial statements were previously issued and reported on, by us, on April 14, 2005. Since our report dated April 14, 2005 the Company has determined the appropriate accounting for the preferred stock transaction in December 2004 in conformity with the provisions of Financial Accounting Standards Board Statement No. 133 *Accounting for Derivative Instruments and Hedging Activities* and Emerging Issues Task Force 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock* as more fully described in Note 18.

/s/Daszkal Bolton LLP

Boca Raton, Florida
April 14, 2005, except for Note 18
which is April 28, 2005

88.     The revised opinion letter was materially misleading for the reasons stated in ¶ 81 above.

89.     Manhattan Transfer reviewed information contained in the Form 10-KSB and was aware that the number of shares listed did not correspond to its own records.

90.     On May 12, 2006, McDonald and the Control Person Defendants caused World Health to issue a press release purporting to report on the Company's financial performance in the first quarter of 2005, and the Company's balance sheet as of March 31, 2005. The release stated that the Company's gross profit for the first quarter was $11.5 million, and "gross margins improved to 28.4% of First Quarter revenue."

91.     This statement was false because, inter alia,

      a.     the balance sheet contained no entry for unpaid withholding tax liability;

      b.     gross profit included revenue earned in the first few days of the second quarter for the J&C Nationwide subsidiary;

      c.     gross profit included a purported $1 million received from a reality television show, which had no associated costs, and apparently was an invention of McDonald; and

29

d.      gross profit improperly included revenue received from exercise of warrants, which should not have been accounted for as operational revenue.

92.      The release also stated that World Health's current liabilities included a $1.09 million loan, and no liability for employee withholding taxes. This was also false, as there was no related party loan, but there was a significant liability for unpaid withholding taxes.

93.      The press release also stated that the Company had 46,879,382 shares outstanding as of March 31, 2005. This was a significant understatement of several million shares.

94.      The financial press release, as a whole, was materially misleading because it did not disclose that McDonald was manipulating financial disclosures in order to conceal the fact that he was enriching himself at the expense of the Company by, inter alia, claiming to be owed money from past loan, and by reaping proceeds of sales of undisclosed stock issuances.

95.      On May 16, 2005, World Health filed its Form 10-QSB for the first quarter of 2005. This filing contained the same financial misrepresentations as the press release. The Form 10-QSB was signed by McDonald and its contents were approved by the Control Person Defendants. Daszkal Bolton conducted a review of World Health's financial statements and approved the financial statements prior to release as well.

96.      Finally, McDonald and the Control Person Defendants caused World Health to mislead investors by omission when they did not inform the market that the Company was overdrawn, and therefore in default, on the CapSource Revolving Credit Facility by mid-May 2005. This default represented a material change in the Company's financial condition, and defendants had a duty to make an appropriate disclosure.

30

97.     On Tuesday, August 16, 2005, before the stock market had opened, defendant Sercu

caused World Health to file a Form 8-K with the SEC, signed by Sercu, reading in its entirety:

> On August 15, 2005, Mr. Richard E. McDonald resigned as President and Chief
> Executive Officer of World Health Alternatives, Inc.
>
> The Company's Board of Directors has appointed John Sercu, its Chief Operating
> Officer, as acting President and Chief Executive Officer until such time as the Board
> of Directors appoints a permanent President and Chief Executive Officer.

98.     A press release, authorized by the Control Person Defendants, issued the same day

stated that the resignation was for "health and family reasons."

99.     The Form 8-K and press release were materially misleading for their failure to

disclose material facts connected to the reasons for McDonald's resignation already known to Sercu

and other management of World Health on August 15, including:

> a.      World Health had no record of having paid payroll taxes for several quarters
> and had not recorded a tax liability on its books for the taxes, due to apparent
> malfeasance by McDonald;
>
> b.      McDonald had declined to provide material financial information to World
> Health's accountants, thus preventing the completion of the Form 10-QSB for
> the second quarter.

100.    Also on the morning of August 16, 2005 Sercu caused World Health to file a Form

NT10-QSB with the SEC, signed by Sercu. This Form is a formal notification of late filing. This

Form stated, "Registrant has been unable to complete the Form 10-QSB for the quarter ended June

30, 2005, within the prescribed time because of delays in completing the preparation of its unaudited

financial statements and its management discussion and analysis. Such delays are primarily due to

registrant's change in management, which has delayed the review of the unaudited financial

statements for the quarter ended June 30, 2005."

31

101.    This statement was materially misleading for its omission of the most serious reasons that the Form 10-QSB could not be issued: McDonald's refusal to provide information prior to his resignation, and the discovery of apparent nonpayment of taxes.

## X. THE DISCLOSURE

102.    The information released on August 16, 2005 caused an immediate drop in the price of World Health common stock from $3.46 per share at the close of August 15 to $2.344 on August 17, with record trading volume of 13,407,000 shares.  Volume remained exceptionally high on August 17 and 18, with over 15,000,000 shares traded on those days.  Because the defendants were continuing to withhold significant adverse information from the stock market, the price of World Health common stock remained artificially inflated.  Investors who contacted World Health between August 16 and 19 received false reassurances that the Company was financially stable despite the resignation of McDonald.

103.    Shortly after McDonald's resignation, an examination of the contents of his office found a brokerage statement showing that, as of the most recent quarter, McDonald had a personal brokerage account holding securities worth above $40 million, of which about $22 million consisted of World Health securities and the remainder consisted of other investments.  At this time, McDonald was 32 years old; had never received a salary above $200,000 per year (and had not been paid in 2004); and had never reported any sales of World Health common stock, as he was legally required to do. The brokerage account apparently represented the proceeds of McDonald's improper self-enrichment at the expense of World Health, which had been facilitated by the Control Person Defendants and Accounting and Transfer Agent Defendants.

104.    The Class Period ends on August 19, 2005.  On that date, World Health announced:

World Health Alternatives, Inc. (OTC BB: WHAI.OB) announced today that, following the recent departure of former Chief Executive Officer, Richard McDonald, the Company is investigating issues that include, but may not be limited to, apparent discrepancies in the amount of the Company's shares outstanding, financial statement recognition of a convertible debenture and warrant agreement associated with the Company's preferred stock, the underpayment of certain tax liabilities in excess of $4 million, and irregular reports to the Company's lenders that resulted in excess funding under the Company's lending arrangements of approximately $6.5 million, in addition to other issues which may constitute breaches of existing financing documents.

The Company has retained outside counsel, and the Board of Directors has retained special counsel to conduct an investigation into the discrepancies. The amounts at issue could change as the investigation continues. Since the Company's stock is traded on the OTC Bulletin Board, the Company does not have the authority to suspend trading of its stock.

The Company has also terminated its engagement with Daszkal Bolton LLP, its outside auditing firm, and will begin a search for a new auditing firm. It is expected that the Company's prior financial reports will be restated. The Company is actively working with its investment banking and funding sources to raise capital to meet its short-term cash obligations. John Sercu, the interim Chief Executive Officer of the Company, stated, "It is very unfortunate to have discovered that we have to deal with these issues, but management and the Board are working diligently to resolve them. The Company continues to make staffing placements of its medical and other professionals on a daily basis with its clients, and we look forward to continuing our business into the future."

105.    This news shocked the stock market for a second time, so that the price fell from an intra-day high of $1.86 per share, to close at $.49 per share, even though trading was suspended shortly after the announcement. A record 32 million shares were traded on August 19.

106.    Neither the Company's stock price, nor the Company, recovered from the fraud. On August 24, 2005 in a Form 8-K signed by Sercu, World Health announced:

The Company's previously issued financial statements for 2004 and 2005 should not be relied upon at this time. The Company intends to restate these financial statements based on the finding of its investigation and following review by a new independent accountant to be engaged by the Company.

33

New management was unable to obtain needed financing, and also was unable to produce financial statements for the second quarter of 2005 or subsequent quarters, or restated financial statements for the earlier periods of 2004 and 2005. World Health filed for Bankruptcy on February 21, 2006, and its assets are being auctioned off.

## XI.  ALLEGATIONS RESPECTING SCIENTER

107.    Daszkal Bolton was aware, or was reckless in failing to make itself aware, of an alarming quantity of "danger signals" or "red flags" that should have led it to conclude it could not reply on Richard McDonald for verification of financial information, but instead should insist on independent verification:

      a.    World Health had had no Chief Financial Officer between June 2004, when Marc Roup left the Company, and mid-2005. See AU § 316.85 A.2, section titled "Opportunities" at subsection b (noting that domination of management by a single person is a fraud risk factor); AU § 316.85 A.3, section titled "Opportunities" at subsection b (noting that "[i]nadequate segregation of duties" constitutes a fraud risk factor);

      b.    For each Form 10-QSB and Form 10-KSB beginning with the second quarter of 2004, McDonald signed all of the Company's Sarbanes-Oxley certifications, as both Chief Executive Officer and as Principal Financial Officer, in violation of the implicit statutory requirements that two individuals sign these certifications. See 15 U.S.C. § 7241(a); 18 U.S.C. §1350(a); AU § 316.85 A.2, section titled "Opportunities" at subsection b (noting that domination of management by a single person is a fraud risk factor); AU § 316.85 A.3, section titled "Opportunities" at subsection b (noting that "[i]nadequate segregation of duties" constitutes a fraud risk factor);

      c.    The period without a full-time Chief Financial Officer coincided with World Health's acquisition of six different companies, all around the United States, increasing the need for qualified financial leadership. *See* AU § 316.85 A.2, section titled "Opportunities" at subsection d (noting that "employment of ineffective accounting. . . staff" is a fraud risk factor);

34

d.     World Health missed the statutory filing deadline for its 2003 Form 10-KSB, the Forms 10-QSB for the second and third quarters of 2004, and the 2004 Form 10-KSB, and also had to file Amended Forms 10-KSB for both 2003 and 2004;

e.     World Health did not issue a Proxy Statement during 2003 or 2004, and did not hold an annual meeting of stockholders in either year;

f.     The Board of Directors had only three members and only two outside directors (McDonald was the third director), none of whom had been elected by shareholders.  See § 316.85 A.2, section titled "Opportunities" at subsection b (noting that "[i]neffective board of directors or audit committee oversight" constitutes a fraud risk factor);

g.     The Company purportedly maintained a 28% operating profit margin, materially above the 22% standard in its industry.  See AU § 316.85 A.2, section titled "Incentives/Pressures" at subsection a (noting that "unusual profitability, especially compared to that of other companies in the same industry" constitutes a fraud risk factor);

h.     The Company's revenue grew from $3.7 million in 2003 to $40.4 million in 2004, and its market capitalization quintupled from $21.4 million in March 25, 2005 to $119 million on March 31, 2005.  See AU § 316.85 A.2, section titled "Incentives/Pressures" at subsection a (noting that "[r]apid growth" constitutes a fraud risk factor);

i.     As discussed above, World Health's financial records superficially appeared to show that McDonald had purportedly lent the Company an amount 10 times greater than his salary, without charging interest.  See AU § 316.85 A.2, section titled "Opportunities" at subsection a (noting that "significant related party transactions not in the ordinary course of business" constitutes a fraud risk factor); AU § 316.85 A.3, section titled "Attitudes/Rationalizations" (noting that "[c]hanges in ... lifestyle that may indicate assets have been misappropriated" constitutes a fraud risk factor);

j.     The purported loan from McDonald to the Company was not adequately documented.  See AU § 316.85 A.3, section titled "Opportunities" at subsection b (noting that a "[l]ack of . . . appropriate documentation of transactions" constitutes a fraud risk factor);

k.     As discussed in ¶¶ 15 - 17 above, Richard McDonald had already admitted in a July 2004 Form 8-K filed with the SEC that he had misrepresented material facts in prior SEC filings, including the 2003 Form 10-K/A,

35

concerning his personal educational achievements. See AU § 316.85 A.2, section titled "Attitudes/Rationalizations" (noting that a "history of violations of securities laws or other laws and regulations" constitutes a fraud risk factor);

l.    World Health had previously been the subject of an SEC investigation in 2003. See AU § 316.85 A.2, section titled "Attitudes/Rationalizations" (noting that a "history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations" constitutes a fraud risk factor);

m.    The Company employed an aggressive growth-by-acquisition strategy and used its stock as currency to fund the acquisitions. See AU § 316.85 A.2, sec. titled "Incentives/Pressures" at subsection b (the "need to obtain additional debt or equity financing to stay competitive - including financing of . . . capital expenditures" constitutes a fraud risk factor); and

n.    The Company's internal controls were inadequate throughout the Class Period, due in large part to the domination of management by a single person - McDonald - and the lack of segregation of duties. See AU § 316.85 A.3, section titled "Opportunities" at subsection b (noting that "[i]nadequate internal control" constitutes a fraud risk factor).

108.    The Control Person Defendants also were aware, or were reckless in failing to make themselves aware, of each of the facts stated in ¶ 107 above, and, accordingly, were reckless in relying exclusively on McDonald without seeking independent verification of the representations.

109.    In addition, Daszkal Bolton's conduct in its reviews and audits represented such an extreme departure from Generally Accepted Auditing Standards as to constitute reckless or fraudulent misconduct for, inter alia, the following reasons:

a.    Daszkal Bolton apparently failed to obtain confirmation of the number of shares outstanding directly from Manhattan Transfer, relying instead of documents supplied by, and edited by, McDonald (see generally AU §§ 326.21(a), 330);

b.    Daszkal Bolton failed to obtain appropriate independent verification of the extremely large "related party loan" purportedly from McDonald, apparently

36

relying instead on verbal representations from McDonald. AU § 334.09-.10. Independent verification could have been sought to determine whether cash had ever changed hands, for example by wire transfer;

c.      Daszkal Bolton failed to identify the absence of an accrual for payroll tax withholdings, which could have been identified through a properly performed search for unrecorded liabilities;

d.      Daszkal Bolton failed to identify the fact that the Company extend each quarter for its J&C Nationwide subsidiary so that revenue actually received in the first few days of each quarter would be accounted for as having been received in the previous quarter;

e.      Daszkal Bolton failed to identify the existence of $1 million in erroneous revenue purportedly received from a reality television show with no related costs recorded; and

f.      Daszkal Bolton failed to identify the recording of erroneous revenue purportedly received from the exercise of warrants.

110.    Manhattan Transfer's <u>scienter</u> is demonstrated by its actual knowledge that the number of shares stated in World Health's public disclosures did not match its records.

## XII. LOSS CAUSATION

111.    The losses incurred by Class Members who held shares through August 15, 2005 were directly caused by defendants' fraud. Up until August 15, 2005, World Health common stock had traded at prices ranging for $2.10 to $4.53 per share throughout the Class Period. The August 16 announcements that McDonald had suddenly resigned and the Company would not file its Form 10-QSB on a timely basis caused an immediate 32% drop in the price of the common stock. McDonald's resignation was instigated by his inability to continue his deceptions; the Form 10-QSB was delayed because McDonald had been unable to provide truthful financial information. The August 19 announcement that the Company had provided false information to CapSource; that financial statements could not be relied upon; and that there were discrepancies in the number of

37

shares outstanding amounted to a description of several parts of the fraud. This caused a further 74%

drop in the price of the stock. The price never recovered after that, demonstrating that these drops

were in no sense an over-reaction to the disclosures. Moreover, the absence of trustworthy financial

statements made needed, long-term financing impossible to obtain, leading directly to the common

stock becoming completely worthless in Bankruptcy.

### XIII.  NO SAFE HARBOR

112.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to the false statements pleaded in this complaint, which consist entirely

of materially false and misleading statements of World Health's historical performance.

### FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

113.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

114.    During the Class Period defendants, and each of them, carried out a plan, scheme and

course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the

investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially

inflate and maintain the market price of World Health's securities; and (iii) cause Lead Plaintiffs and

other members of the Class to purchase World Health's securities at artificially inflated prices.  In

furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took

the actions set forth herein.

115.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for World Health's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

116.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

117.    The defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about World Health as specified herein.

118.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

39

of conduct as alleged herein, in an effort to assure investors of World Health's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about World Health, and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of World Health's securities during the Class Period.

119.     Each of the Control Person Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Control Person Defendants were high-level executives and directors at the Company during the Class Period and members of the Company's management team and had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with McDonald and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, sales, and internal controls at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

120.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing World Health's operating condition from the investing public and supporting the artificially inflated prices of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

121. As a result of the dissemination of the materially false and misleading information, and failure to disclose material facts, as set forth above, the market price of World Health common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of World Health common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired World Health common stock during the Class Period at artificially high prices and were damaged by disclosure of the truth.

122. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true financial condition of World Health, Lead Plaintiffs and other members of the Class would not have

41

purchased World Health common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

123.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

124.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

125.    Defendant McDonald is liable for all of the Company's public statements and non-disclosures from the beginning of the Class Period until his resignation on August 15, 2005. Defendants Higbee and Jackson are liable for the statements contained in the 2004 10-KSB, which they signed, and the Forms 10-KSB, which they approved.  Defendant Sercu is liable for the quarterly press releases, which quoted him and which he approved, and the August 16, 2005 Form 8-K and Form NTQ-SB, which he signed.  Defendant Daszkal Bolton is liable for the financial portions of Form 10-KSB, which they purportedly audited and signed, and the Forms 10-QSB which they reviewed and approved.  Defendant Manhattan Transfer is liable for the representations concerning number of shares outstanding, for which it supplied information which it was aware had been altered and falsely reported.

## SECOND CLAIM

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE CONTROL PERSON DEFENDANTS

126.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

127.    The Control Person Defendants acted as controlling persons of World Health within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Control Person Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  The Control Person Defendants were provided with and/or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

128.    In particular, each of these defendants had direct and supervisory involvement over the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

129.    As set forth above, the Control Person Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

43

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiffs hereby demands a trial by jury.

Dated: April 21, 2006

**CAROSELLI, BEACHLER, McTIERNAN & CONBOY, LLC**

William R. Caroselli
G. Timothy Conboy
312 Boulevard of Allies, 8th Floor
Pittsburgh, PA 15222-1916
(412) 391-9860
(412) 391-7453 (Fax)
*Liaison Counsel for the Class*

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Arthur Stock
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4606 (Fax)
*Lead Counsel for the Class*

# EXHIBIT

# A

**WORLD HEALTH ALTERNATIVES, INC.**
**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS**

Matthew D. Ockner, on behalf of Columbus Capital Partners, L.P. ("Plaintiff"), an investment fund, duly swears and says, as to the claims asserted under the federal securities laws, that:

1.      I am the Managing Member of Plaintiff's general partner and investment manager, Columbus Capital Management, LLC. I have the authority to authorize litigation on behalf of Plaintiff. I have reviewed the Complaint and authorize its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of its counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the securities of World Health between and including August 17, 2004 through August 19, 2005 (the "Class Period") appear on the attached schedule.

5.      Plaintiff has not sought to serve as a class representative in any other actions filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6.      Plaintiff has not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond its pro rata share of any recovery, except for any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21 day of April, 2006.


By:      _____
         Matthew D. Ockner, C.F.A.
         Managing Member, Columbus Capital Management, LLC
         for Columbus Capital Partners, L.P.

Columbus Capital Partners, L.P.

World Health Alternatives
Class Period : 06/06/2003-08/21/2005

| Transaction Date | Shares Purchased | Purchase Price | Shares Sold | Sale Price |
|---|---|---|---|---|
| 6/22/2005 | 299,800 | $3.0110 | | |
| 6/22/2005 | 60,000 | $3.0539 | | |
| 6/23/2005 | 269,800 | $3.3503 | | |
| 6/23/2005 | 119,900 | $3.3323 | | |
| 6/27/2005 | 67,000 | $3.2897 | | |
| 6/28/2005 | 90,000 | $3.3993 | | |
| 6/28/2005 | 53,000 | $3.4151 | | |
| 6/29/2005 | 73,100 | $3.5300 | | |
| 6/30/2005 | 55,800 | $3.7418 | | |
| 6/30/2005 | 14,000 | $3.7800 | | |
| 7/1/2005 | 28,000 | $3.6210 | | |
| 7/6/2005 | 87,000 | $3.4263 | | |
| 7/12/2005 | 84,000 | $3.0059 | | |
| 7/20/2005 | 28,000 | $3.1161 | | |
| 7/20/2005 | 14,000 | $3.1937 | | |
| 8/16/2005 | 104,200 | $2.7017 | | |
| 8/16/2005 | 98,800 | $2.7707 | | |
| 8/16/2005 | 129,700 | $2.7349 | | |
| 8/17/2005 | | | 400,400 | $1.9211 |
| 8/18/2005 | 438,800 | $2.0419 | | |
| 8/18/2005 | 383,900 | $2.0336 | | |
| 8/19/2005 | 76,800 | $1.6112 | | |
| **Shares Purchased** | **2,575,600** | **Shares Sold** | **400,400** | |

## WORLD HEALTH ALTERNATIVES, INC.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Matthew D. Ockner, on behalf of Columbus Capital Offshore Fund, Ltd. ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1.    I am the Managing Member of Plaintiff's investment manager, Columbus Capital Management, LLC.  I have the authority to authorize litigation on behalf of Plaintiff.  I have reviewed the Complaint and authorize its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of its counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in the securities of World Health between and including August 17, 2004 through August 19, 2005 (the "Class Period") appear on the attached schedule.

5.    Plaintiff has not sought to serve as a class representative in any other actions filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6.    Plaintiff has not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond its pro rata share of any recovery, except for any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 21 day of _April_, 2006.

By: _____
Matthew D. Ockner, C.F.A.
Managing Member, Columbus Capital Management, LLC
for Columbus Capital Offshore Fund, Ltd.

## Columbus Capital Offshore Fund, Ltd.

### World Health Alternatives
### Class Period : 06/06/2003-08/21/2005

| Transaction Date | Shares Purchased | Purchase Price | Shares Sold | Sale Price |
|---|---|---|---|---|
| 6/22/2005 | 200,200 | $3.0110 | | |
| 6/22/2005 | 40,000 | $3.0539 | | |
| 6/23/2005 | 180,200 | $3.3503 | | |
| 6/23/2005 | 80,100 | $3.3323 | | |
| 6/27/2005 | 44,700 | $3.2897 | | |
| 6/28/2005 | 60,000 | $3.3993 | | |
| 6/28/2005 | 35,300 | $3.4151 | | |
| 6/29/2005 | 176,900 | $3.5300 | | |
| 6/30/2005 | 44,200 | $3.7418 | | |
| 6/30/2005 | 11,000 | $3.7800 | | |
| 7/1/2005 | 22,000 | $3.6210 | | |
| 7/6/2005 | 63,000 | $3.4253 | | |
| 7/12/2005 | 66,600 | $3.0059 | | |
| 7/20/2005 | 22,000 | $3.1161 | | |
| 7/20/2005 | 11,000 | $3.1937 | | |
| 8/16/2005 | 85,800 | $2.7017 | | |
| 8/16/2005 | 155,300 | $2.7349 | | |
| 8/16/2005 | 81,200 | $2.7707 | | |
| 8/17/2005 | | | 329,600 | $1.9210 |
| 8/18/2005 | 361,200 | $2.0419 | | |
| 8/18/2005 | 316,100 | $2.0336 | | |
| 8/19/2005 | 63,200 | $1.5112 | | |
| **Shares** | **2,120,000** | **Shares Sold** | **329,600** | |